IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ARTHUR M. JOHNSON, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. ) | Case No. 12-cv-1051-MJR |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

In January 2011, Arthur Johnson was indicted on wire fraud and bribery charges in connection with his role in a housing development scheme in East Saint Louis, Illinois. Johnson pled guilty to those charges in 2011 pursuant to a plea agreement and was sentenced to 37 months imprisonment and 3 years of supervised release. The plea agreement contained a direct appeal waiver and a collateral petition waiver, but despite those waivers, Johnson filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 in October 2012. Johnson claimed that his counsel was ineffective in a variety of ways concerning his wire fraud counts and his sentence, and that the Court erred in the way in which it sentenced him for the wire fraud counts. Johnson later supplemented his § 2255 petition with another ineffective assistance of counsel claim, this one concerning statements he made to police prior to his indictment.

The United States moved to dismiss the original motion to vacate and the supplement, claiming that the collateral waiver doomed any § 2255 petition. Johnson has responded, and the United States' motion is now before the Court for review.

## Background

In early 2008, the City of East Saint Louis targeted the Emerson Park area of the city for redevelopment, seeking to use that area to build affordable housing for the city. Gary Johnson, a builder in Saint Louis, Missouri, was interested in tossing his hat into the ring to handle the project, but he was having financial problems and didn't have the wherewithal to submit a proposal on his own. He reached out to Harold Rosen—an investor who owned an outfit called Kully Construction and with whom Gary had previous dealings—and the two decided that they would submit a proposal through Rosen's company. Rosen and Gary met with East Saint Louis officials to discuss the project, and those discussions brought them into contact with Arthur Johnson, the Director of the East Saint Louis Community Development office, and his niece, another city employee. The city wanted a redevelopment proposal from Rosen laying out his plan, so Rosen hired Johnson's niece to draft it. Her first draft was of such low quality that Rosen asked Johnson to rewrite it, and Rosen paid Johnson $500 for his trouble.

Rosen's bid was selected and approved by the East Saint Louis Mayor, the City Council, the Tax Increment Financing Department of East Saint Louis, and the East Saint Louis Community Development office—the latter hardly surprising given that Johnson directed the office. The project included some public financing, made up of community development grants and tax increment financing, as well as Rosen's private

2

promise (through Kully Construction) to contribute a little over three million dollars of funds. Because public financing was on the table, the project was also contingent on the approval and oversight of the East Saint Louis Financial Advisory Authority, a State of Illinois agency established to provide financial oversight and assistance to the city.

The Financial Advisory Authority began vetting the project after the city's approval, and it soon became concerned that Rosen might be trying to get at the public funds without expending his own. The Authority conditioned release of the public monies and approval of the project on proof that Rosen had actually secured private funding. In response to the Authority's skepticism, Rosen sent the Authority a letter purporting to verify private funding from First Community Credit Union. The letter, which only said that another business owned by Rosen had enough assets to finance the project, was deemed insufficient by the Authority, and the Authority voted to reject Rosen's proposal. Rosen wasn't deterred by the Authority's provisional vote against him; he submitted more documents to it, all in an attempt show that he had private funding. Those, too, were rejected for various reasons: many were only provisional promises to lend, and one was from an institution of questionable provenance.

The Authority, now highly skeptical of Rosen's intentions given the irregularities in one of his financing letters, disclosed its concerns to officials in East Saint Louis and continued to reject Rosen's proposal. In response, Rosen doubled down: he submitted an amended proposal, seeking to "upgrade" the project from a 32-unit one to a 56-unit one, all for the same amount of money as the initial project. The Authority engaged in just as dogged review as it did before and found inconsistencies and cost estimate

irregularities in the proposal. It again told East Saint Louis officials of those inconsistencies and expressed its doubts to Rosen, but Rosen shrugged off the Authority's concerns and said that the price differences were due to materials bargains caused by the recession. To allay the Authority's financing concerns, Rosen also submitted a commitment letter, purportedly from MDE Capital, indicating that he had secured $3.6 million in funding. The Authority remained skeptical, but East Saint Louis officials were pressuring it to approve the project, so it did. That approval allowed Rosen to begin incurring costs that were eligible for reimbursement with public funds.

While the Authority approved the project, it told Rosen that he couldn't ask for any reimbursement until he verified private financing. As it turns out, that was a wise condition—the letter from MDE Capital was no longer good, as MDE ultimately refused to finance Rosen after he asked an MDE representative to provide him with fraudulent financing documents. Despite the MDE setback, Rosen moved forward on the housing development and incurred some development costs, and he continued to try to secure a private financer so that those costs would be reimbursed. The financing efforts went to pot: Rosen approached four separate agencies, and all of them rejected his proposals and sent him on his way, with one rejecting him after Rosen tried submitting fake tax returns and other fake financial documents. Those financing attempts cost Rosen time, and by the time they were concluded the Authority was itching for verification that Rosen truly had private financing. To get the Authority off his back and get his development costs reimbursed, Rosen resulted to fraud—he sent the Authority a contract purporting to verify funding not from MDE Capital, as expected, but from First

4

Monetary Group, Inc.  The promise from First Monetary was hollow—it was a broker who matched borrowers with lenders and not a true lender—but Rosen told the Authority that the contract fulfilled his obligation to obtain financing.  The Authority resolved itself to investigate, but in the meantime it accepted Rosen's verification, an acceptance that gave Rosen the ability to submit public fund reimbursement requests.

During the time that the Authority was sniffing at First Monetary, Rosen submitted four reimbursement requests for project expenses.  Two were approved, one was partly approved, and one was denied, and from that Rosen was paid around $66,000.  The partly approved request was accompanied by a list of itemized expenditures, including one for $40,000 from Serra, a subcontractor hired by Rosen to work at the development site.  The Authority had questions about that expenditure and asked for more information, so Rosen submitted an invoice to the Authority stating that Rosen paid $40,000 to Serra for land clearing, and a copy of a lien waiver purporting to show that Serra was paid $40,000.  Both of those were fraudulent:  Serra had done far less work than Rosen indicated due to lien issues with the property, so the contract was modified to reduce the payment to $24,000, and from that Rosen only paid Serra $3,000.

Rosen had lingering concerns that the Authority still wouldn't buy the $40,000 bill despite his fraudulent documentation, so in December 2009, he went to East Saint Louis City Hall and met with Johnson.  Rosen told Johnson that he hadn't been reimbursed for the expense and Johnson decided to help.  Later that month, Johnson learned that—contrary to the documents Rosen had submitted to the Authority—Serra had never been paid the full amount of the invoice.  Despite those irregularities,

5

Johnson still went to bat to assist Rosen in early January 2010: Rosen faxed Johnson an invoice that falsely stated that $40,000 had been paid to Serra for land clearing, and Johnson prepared a memorandum to the Authority verifying that expense and others. The Authority reviewed Johnson's memorandum and still had doubts about the $40,000 charge, so it rejected it. Johnson and the East Saint Louis Mayor pleaded with the Authority to reconsider and told officials that Rosen couldn't prove payment because the payment was made in cash, but the Authority still refused the reimbursement request and insisted on more than Rosen and Serra's say-so to prove up payment.

Rosen wasn't inclined to give up, so he drafted a letter ostensibly from Serra, which was addressed to Johnson and the Director of the Financial Advisory Authority. The letter stated that Serra did receive $40,000 from Rosen (through Kully Construction) and that Serra issued a lien waiver for the full amount upon receiving payment. Rosen faxed the unsigned letter to Serra and told him to sign it and then fax it to Johnson at East Saint Louis City Hall. Serra did as he was told, and then Johnson verified the expense and again sent it to the Authority for reimbursement. The Authority still didn't buy it: it reimbursed some of Rosen's expenses but rejected the Serra bill.

Throughout 2009 and 2010, Rosen's financing and billing improprieties had come to the attention of law enforcement. According to Johnson, his office was undergoing an audit by the United States Housing and Urban Development Agency at that time concerning several housing projects, and he worked with agents from the United States Office of the Inspector General on that audit on a semi-regular basis. Officers evidently became interested in flipping Johnson to assist in the investigation of Rosen—according

6

to Johnson, on March 10, 2010, an agent with the Inspector General allegedly tricked Johnson into getting into his car, ostensibly to assist the agent with a housing site inspection. Rather than drive to the housing project, though, the agent drove Johnson to the parking lot behind the federal courthouse in East Saint Louis. As the agent's car arrived at the courthouse, another car pulled in front of it, and two men exited. Johnson asked the agent what was going on, and the agent told him that the approaching men were officers with the Federal Bureau of Investigation and that they needed Johnson's help in investigating something going on at East Saint Louis City Hall.

      The two men introduced themselves to Johnson, confirmed that they were federal officers, and asked if Johnson would be willing to talk with them concerning their investigation. The two told Johnson that he did not have to speak with them and that he was free to go at any time. Johnson told the agents he would speak to them and was then escorted into the courthouse. He went through the typical courthouse security screening and his cell phone was secured at the entry desk. Johnson was then taken to the third floor of the courthouse and escorted into a waiting room. According to Johnson, the room was windowless, had two doors (one leading to the public area of the courthouse and one leading to more internal offices), and measured approximately eight feet wide by ten feet long. Johnson was asked to sit in the corner to the right of the entry door, and the three agents then pulled up chairs in a semi-circle around him. The three then asked Johnson questions about his involvement in Rosen's housing project, and Johnson admitted that he rewrote Rosen's housing proposal, that he was paid for that work, and that he knew Rosen's claim for the Serra land clearing was

bogus and that he shouldn't have let it through. Johnson says that officers then asked him to wear a wire to attempt to prove the Mayor's involvement in the scheme; he allegedly agreed to do so initially and left the meeting, but later changed his mind.

After the March meeting and Johnson's purported change of heart, law enforcement continued to gather evidence, and Rosen and Johnson were ultimately indicted in January 2011 on charges of wire fraud and bribery. After a proffer with the United States Attorney concerning the evidence that would be offered against him should he take the case to trial, Johnson pled guilty to two counts of wire fraud and one count of bribery. His plea agreement included proposed reductions to his sentencing range for acceptance of responsibility and a waiver of his direct appeal and collateral petition rights. In November 2011, Johnson was sentenced to 37 months imprisonment.

In September 2012, Johnson filed a motion to vacate, set aside, or correct his sentence pursuant to 18 U.S.C. § 2255, raising several grounds for relief. Johnson first argued that his counsel was ineffective by failing to counter a number of allegedly incorrect statements made by the United States Attorney during sentencing, namely that Johnson committed a misdemeanor in not filing his 2009 and 2010 tax returns, that Johnson had illegally obtained unemployment benefits, that East Saint Louis was rife with public corruption, and that public corruption cases are rarely prosecuted. Johnson also claimed that counsel was ineffective for not seeking a downward departure for a mitigating role under the sentencing guidelines and for not filing a direct appeal to argue Johnson's innocence on the wire fraud charges. Finally, Johnson said that the Court erred by increasing his sentence for wire fraud because those counts were

8

grouped for sentencing purposes.  Shortly after he filed his motion, Johnson moved to supplement, seeking to tack on a claim that his counsel was ineffective for failing to move to suppress the statements Johnson made to officers in March 2010 at the federal courthouse, as the officers didn't give him a *Miranda* warning prior to questioning.

In October 2012, the United States moved to dismiss Johnson's motion to vacate, set aside, or correct his sentence on the grounds that the collateral waiver foreclosed any relief.  The United States supplemented that motion in April 2013, seeking to apply the same logic to Johnson's *Miranda* clam.  Johnson responded to the motion throughout 2013, and the United States' motion to dismiss is now before the Court for review.

## Discussion

The United States has moved to dismiss Johnson's motion to vacate, set aside, or correct his sentence based on Johnson's waiver of his collateral rights, so the Court will begin there.  Waivers of direct appeal and collateral review are contracts and are generally enforceable, but that enforceability is subject to a few exceptions—some peculiar to contract law and others unique to criminal cases.  **United States v. Chapa, 602 F.3d 865, 868 (7th Cir. 2010).**  These waivers are unenforceable or don't apply when the United States materially breaches the agreement or the dispute falls outside the scope of the waiver, and they have no force when the plea to which the waiver was a part was not knowing or voluntary or was the result of ineffective assistance of counsel.  *Hurlow v. United States*, **726 F.3d 958, 964 (7th Cir. 20103).**  Beyond those exceptions and others typical of contract law, waivers must stand, as they represent a quid pro quo

9

between the United States and a defendant where both gave up advantages to obtain something from the other. *United States v. Wenger*, 58 F.3d 280, 282 (7th Cir. 1995).

Johnson's arguments against the waiver are a bit difficult to follow, but he seems to start off by arguing that his plea wasn't knowing or voluntary due to coercion by the United States during a proffer before the scheduled trial—he says that the United States presented the evidence concerning the wire fraud counts in such a way that he was improperly convinced of his guilt. Johnson isn't all that specific as to what the United States did to improperly coerce him at the proffer beyond presenting evidence, and he should know that there's nothing inherently wrong with the United States laying out what evidence it will offer up at trial if a criminal defendant is considering that path. More importantly, the notion that Johnson was coerced by the proffer is belied by the plea agreement that Johnson signed and the statements Johnson made at his colloquy. The plea agreement indicates that "no promises, inducements, or representations" were made to induce Johnson to enter the plea, other than those made in the plea agreement itself. Johnson confirmed that to be the case at the colloquy—when asked by the undersigned whether anyone had used "threats, coercion, force, undue influence, promises, assurances, or guarantees of any kind" to get him to plead guilty or to agree to the plea agreement, Johnson unequivocally said no. All of those statements are entitled to a presumption of verity, and Johnson hasn't alleged enough to undercut that presumption. *Barker v. United States*, 7 F.3d 629, 634 n.5 (7th Cir. 1993).

Johnson goes on to argue that the plea wasn't knowing or voluntary because he was never informed of the elements of wire fraud, but that assertion, too, is

10

contradicted by the plea colloquy, plea agreement, and statement of facts attendant to the plea. In the plea agreement, Johnson acknowledged that he had been advised and fully understood the nature of the charge to which the plea is offered, he was told of the elements of the wire fraud charges, and he specifically agreed and admitted that those elements were established by his conduct. Johnson went on to admit the factual particulars of the wire fraud in the statement of facts, and the undersigned confirmed at the plea colloquy that Johnson understood the elements of the wire fraud charges and that he agreed that the United States could prove all of those elements. Like his last statements, those statements, too, are entitled to a presumption of truth, and Johnson's conclusory statements that he did not understand the elements doesn't get him around that presumption. This basis for avoiding the waiver must be rejected.

Johnson next argues that his plea wasn't voluntary because his counsel was ineffective, as counsel didn't conduct a thorough investigation prior to the plea, didn't interject during the proffer, and didn't ably review all of the evidence with him before the plea—especially evidence concerning an interview the United States conducted with Gary Johnson, another participant in the housing scheme. That argument fails for the simple reason that the record refutes it. Johnson stated in the plea agreement that the United States provided complete discovery and that he had reviewed that discovery compliance with his attorney. Johnson went on to attest that he and his attorney had discussed the United States' case and Johnson's defenses to it, and that the two had explored all areas which Johnson had requested relative to the United States' case and his defense. Despite that consultation, said the agreement, Johnson still decided to

11

plead guilty. The undersigned confirmed all of this at the plea colloquy—the Court asked Johnson if he was fully satisfied with counsel's representation and advice thus far, and Johnson said that he was. Johnson's nonspecific protests concerning counsel's performance with respect to the investigation, the proffer, and evidence review prior to the plea can't overcome Johnson's statements to the contrary, especially given that Johnson would have known about these particular concerns at the time of the plea. *See United States v. Peterson*, **414 F.3d 825, 827 (7th Cir. 2005) ("Judges need not let litigants contradict themselves so readily; a motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction.").**

Johnson also suggests that the waiver should be set aside because counsel was ineffective in not moving to suppress statements Johnson made to law enforcement officials prior to his arrest on March 10, 2010—the statements were made when Johnson was in custody, he says, and they should have been suppressed because law enforcement never gave him *Miranda* warnings. *Hurlow v. United States*, **726 F.3d 958, 967 (7th Cir. 2013)**, and *United States v. Cieslowski*, **410 F.3d 353, 358-60 (7th Cir. 2005)**, teach that suppression-related ineffectiveness can vitiate a collateral waiver. The Court says "can" because suppression-related ineffectiveness depends on a showing by the petitioner that the motion to suppress would have been granted had counsel made it; without proof of success, there's no prejudice, and thus no ineffective assistance. *United States v. Bustamante,* **367 F. App'x 708, 710 (7th Cir. 2010).**

This merit point disposes of Johnson's suppression-related claim—had counsel moved to suppress, he would have lost. The lynchpin of any motion to suppress would have been whether Johnson was in custody at the time that law enforcement questioned him. Whether a person is in custody turns on several factors, including the location of the questioning, whether the suspect consented to speak to officers, whether officers told the suspect that he was not under arrest, whether the suspect was moved to another area, whether there was a display of force, whether the officers deprived the suspect of things he would need to leave, and the officers' tone. **United States v. Barker, 467 F.3d 625, 628 (7th Cir. 2006).** These factors are, of course, not exhaustive, and they are all designed to ascertain whether—in light of the objective circumstances—a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. **United States v. Borostowski, 775 F.3d 851, 859 (7th Cir. 2014).**

Taking Johnson's narrative at face value, he says that officers tricked him into coming to the parking lot at the federal courthouse in East Saint Louis, asked him if he would talk with them, advised him that he was not under arrest and that he did not have to speak with them, and then questioned him for two-and-one-half hours in an eight-foot-by-ten-foot waiting room in the courthouse, during which Johnson made some inculpatory statements about his involvement in the housing scheme. A few parts of Johnson's narrative suggest that the questioning was custodial, but a closer look reveals that these points aren't as problematic as Johnson makes them out to be. Johnson focuses first on the fact that police tricked him into coming to the parking lot prior to the interview, but police trickery doesn't always mean that an interview was

13

non-consensual, *United States v. Martinez*, 602 F. App'x 658, 659 (9th Cir. 2015); *United States v. Rainey*, 404 F. App'x 46, 56 (7th Cir. 2010), and the police's ruse here—quite different from the tricks where courts have suggested a lack of consent to speak with police—ended at the parking lot of the courthouse, after which Johnson was told that he could leave and was under no obligation to talk with police.  Johnson also protests the authorities' decision to transport him to another location for the interview, but the police could hardly question him in his city office, especially given that their investigation concerned public corruption in that office.  *See United States v. Littledale*, **652 F.3d 698, 702 (7th Cir. 2011) (recognizing difficulty in questioning individual in public as the conversation concerned child pornography).**

Johnson's biggest complaints are that officers interviewed him in a small room and were positioned in a way as to make it difficult for him to leave the interview without brushing by them.  To be sure, those points can suggest that an encounter was custodial, but they are not dispositive—other aspects of an interview can militate against a finding of custody, *United States v. Jones*, **523 F.3d 1235, 1243 (10th Cir. 2008);** *United States v. Thompson*, **496 F.3d 807, 811 (7th Cir. 2007)**, and they do so here.  For one, Johnson admits that officers told him at the outset that he did not have to converse with them, that he was not under arrest, and that he was free leave at any time, and all of those points suggest that he could leave if he wanted.  *United States v. Humphrey*, **34 F.3d 551, 554 (7th Cir. 1994).**  In addition, Johnson doesn't claim that the door to the room was locked, and the interview took place in a public courthouse—a setting that the Seventh Circuit has looked on favorably when officers are left to choose between the

more coercive environment of a police station or a more public building. *United States v. Slaight*, **620 F.3d 816, 818 (7th Cir. 2010).** Once more, while Johnson said that the officers were armed during the interview, their handguns were holstered, Johnson doesn't claim that their tone of voice implied that he couldn't leave, and his interview didn't occur after any show of force. *Littledale*, **652 F.3d 698, 701-02 (7th Cir. 2011).** Finally, police told Johnson that they wished to interview him because they needed his help, and Johnson does not allege—and the record does not reflect—that Johnson was arrested at the end of the interview. *United States v. Thompson*, **496 F.3d 807, 811 (7th Cir. 2007).** Taking all of the facts as Johnson has alleged together, the Court is not of the view that Johnson was in custody during the interview, meaning that counsel was not ineffective in not moving to suppress the statements Johnson made to officers.

Johnson's remaining arguments against application of the waiver don't warrant extended discussion. He suggests that counsel concealed evidence from him and that he discovered that evidence after the plea, but he doesn't say what that evidence was or how it impacted his plea, and those types of broad, non-specific challenges to counsel's performance aren't enough to get around a waiver. *Hurlow*, **726 F.3d at 966.** Johnson also insists that he told his lawyer to appeal his wire count convictions on actual innocence grounds, but he never alleges that he asked his lawyer to move to set aside the plea or that he wanted to set aside the plea and forego its many benefits, so his lawyer's decision to not appeal in light of the appellate waiver isn't ineffective and isn't a means to get around the waiver. *Nunez v. United States*, **546 F.3d 450, 455 (7th Cir. 2008).** With these challenges resolved, the Court finds that the waiver is intact, and that

all of Johnson's challenges—beyond those concerning the validity of the waiver that were already dealt with above—fall within its ambit. The waiver thus dooms Johnson's motion, so his motion to vacate, set aside, or correct his sentence must be denied.

There is one closing item: pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant, as the applicant cannot appeal without one. The habeas statute provides that a certificate may issue only where the petitioner "has made a substantial showing of the denial of a constitutional right," **28 U.S.C. § 2253**, as would be the case when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, **529 U.S. 473, 484 (2000).** Based upon the record before it, the Court concludes that reasonable jurists wouldn't find Johnson's points debatable, so the Court must deny a certificate of appealability.

## Disposition

Because Johnson's waiver is valid, and because it applies to all of the challenges in his motion to vacate, set aside, or correct his sentence, the United States' motion to dismiss (Doc. 4) is **GRANTED**. Johnson's § 2255 motion is **DISMISSED**, and the Court **DENIES** a certificate of appealability. The **CLERK** is **DIRECTED** to close this case.

**IT IS SO ORDERED.**

DATED: January 28, 2016

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**